IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-108

No. 48A21

Filed 24 September 2021

IN THE MATTER OF: K.B. & G.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 20 October 2020 by Judge Beverly Scarlett in the District Court of Orange County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee Orange County Department of Social Services.*

*Steven C. Wilson for appellee Guardian ad Litem.*

*Jeffrey L. Miller for respondent-appellant mother.*

*Sydney Batch for respondent-appellant father.*

HUDSON, Justice.

Respondents appeal from orders terminating their parental rights in their children, K.B. (Kate)[1] and G.B. (Greg) (collectively the children). Respondent-mother challenges the trial court's conclusion that grounds existed to terminate her parental rights in the children pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) (2019).

---

[1] Pseudonyms are used to protect the identity of the juveniles and for ease of reading.

Respondent-father argues the trial court abused its discretion in concluding that it was in the children's best interests that his parental rights be terminated. For the reasons stated herein, we affirm.

## I. Background

Respondents are the parents of Kate, born in September 2012, and Greg, born in December 2014. On 22 February 2013, Orange County Department of Social Services (DSS) filed a petition alleging Kate was a neglected and dependent juvenile. The petition alleged that in September 2012, DSS received a report that respondents had a violent argument wherein law enforcement was called, both parents were intoxicated, and Kate was present. As a result of this incident, respondents signed a safety plan in which they agreed to refrain from drinking when caring for Kate and from arguing in Kate's presence. On 1 November 2012, however, law enforcement responded to another domestic violence call. Then, on 25 December 2012, respondent-father reported to law enforcement that respondent-mother was intoxicated and driving with Kate in the back seat of the car. On 14 February 2013, respondent-mother was stopped by the North Carolina Highway Patrol for driving under the influence. A safety agreement was reached where respondent-mother agreed to not drive Kate except to drop her off at daycare in the mornings. The petition further alleged that respondent-father completed a substance abuse assessment and had been cooperative with DSS but continued to abuse alcohol. He acknowledged his

addiction and agreed to seek treatment. Respondent-mother was less cooperative with DSS and denied her addiction. DSS alleged that Kate was at high risk of harm due to respondents' substance abuse.

¶ 3    On 5 March 2013, respondents agreed to entry of a consent order that granted temporary custody of Kate to DSS. On 21 March 2013, the trial court entered a temporary custody order continuing Kate's custody with DSS. On 29 May 2013, Kate was adjudicated a neglected and dependent juvenile, and the trial court concluded that it was in her best interests that she remain in the custody of DSS. Respondent-mother was ordered to complete a screening for Family Drug Treatment Court (FDTC) and, if accepted, to comply with treatment recommendations. In the event she was not accepted into FDTC, the court ordered her to engage in intensive outpatient substance abuse services and to follow all recommendations. Respondent-father was ordered to continue to engage in substance abuse treatment and follow all recommendations and to engage in mental health treatment to address anger issues. Respondents were ordered to complete drug and alcohol screens as requested by DSS, to refrain from using drugs or alcohol, and to have supervised visitation with Kate.

¶ 4    On 7 August 2013, the trial court entered an order suspending Kate's visitation with respondent-mother. The trial court entered a permanency planning order on 17 December 2013 reinstating respondent-mother's supervised visitation with Kate and setting the permanent plan for Kate to be reunification with respondent-father with

a concurrent plan of reunification with respondent-mother. The trial court entered a permanency planning order on 19 March 2014, setting reunification with respondent-father as the permanent plan for Kate with a concurrent plan of guardianship with the maternal grandmother and authorizing a trial home placement of Kate with respondent-father. On 30 January 2015, the trial court entered a permanency planning and custody order awarding respondent-father custody of Kate and granting supervised visitation to respondent-mother. The order transferred jurisdiction from juvenile to domestic court pursuant to N.C.G.S. § 7B-911.

¶ 5 On 17 December 2015, DSS filed juvenile petitions alleging that Kate and Greg were neglected and dependent juveniles. The petitions alleged that on 11 December 2015, DSS received a report of domestic violence and substance abuse by respondents. Respondent-mother reported that respondent-father had been "smoking crack" at least five times a week, drinking alcohol, and acting erratically. She also reported that domestic violence occurred between them. Respondent-father was arrested on 9 December 2015 and released the following day. Respondents failed to complete a drug screen as requested. Respondent-father reported taking Percocet, and respondent-mother reported using alcohol and marijuana a month earlier.

¶ 6 On 22 December 2015, respondents agreed to the entry of a consent order that continued non-secure custody and placement authority with DSS. On 29 February 2016, the trial court entered an order adjudicating Kate and Greg to be neglected

juveniles and continuing custody with DSS. Respondents were ordered to, among other things, participate in substance abuse services and follow recommendations, submit to random drug screens, participate in individual therapy, and participate in supervised visitation with the children. On 15 June 2016, the trial court entered a custody order that continued custody of Kate and Greg with DSS and set the primary plan as reunification with a parent, with a secondary plan of guardianship/custody with a relative.

On 3 January 2017, the trial court entered a permanency planning order authorizing a trial home placement of Kate and Greg with respondent-father. The trial court entered a permanency planning and custody order on 9 March 2017 awarding custody of Kate and Greg to respondent-father and granting supervised visitation to respondent-mother. The order transferred jurisdiction from juvenile to domestic court pursuant to N.C.G.S. § 7B-911.

On 11 April 2019, DSS obtained non-secure custody of Kate and Greg and placed them in their maternal grandmother's home, where respondent-mother was also living. DSS also filed juvenile petitions alleging them to be neglected juveniles. The petition alleged that on 7 April 2019, there was an argument between respondent-father and his eldest daughter's[2] boyfriend in which respondent-father attempted to strike the boyfriend with a bat and aimed a gun at him. Kate was inside

---

[2] Respondent-father's eldest daughter is not a subject of this appeal.

the home during the incident. On 10 April 2019, DSS received a Child Protective Services (CPS) report that respondent-father had physically abused his eldest daughter. His eldest daughter reported that respondent-father was abusing substances, sleeping all day (resulting in her truancy), and staying away from home for extended periods of time without communication. Respondent-mother completed a drug screen on 9 January 2019 which was "positive for extended opiates, oxycodone." Respondent-mother had not engaged in any substance abuse treatment since respondent-father was awarded custody of Kate and Greg in 2017. The petition further alleged Kate and Greg were at substantial risk of mental, physical, and emotional impairment in the care and custody of respondent-father, and respondent-mother was not appropriate for placement. On 16 April 2019, respondents agreed to a consent order that continued custody of Kate and Greg with DSS, ordered supervised visitation with respondent-father, and ordered respondent-mother to be supervised at all times around the children.

¶ 9     On 13 August 2019, the trial court entered an order adjudicating Kate and Greg to be neglected juveniles. The trial court continued the children's placement with their maternal grandmother and allowed respondent-mother to continue living in the home with the children, as long as her contact with them was supervised by the maternal grandmother or other DSS-approved supervisor. Respondent-father was granted supervised visitation with the children. Respondent-father was ordered

to: comply with random drug screens; complete an assessment with Pathways to Change and follow recommendations; complete updated mental health and substance abuse assessments and follow recommendations; and comply with all recommendations of FDTC. Respondent-mother was ordered to comply with random drug screens and complete a substance abuse and mental health assessment and follow all recommendations.

¶ 10       On 6 August 2019, respondent-mother filed a motion for unsupervised visitation with the children. On 29 August 2019, the trial court ordered respondent-mother to comply with random drug screens, to complete A Fresh Start treatment program and follow recommendations, to engage in current substance abuse treatment consistent with her case plan, and to have negative drug screens. The trial court also ordered that respondent-mother's visitation and contacts with the children should remain supervised, but granted DSS and the treatment team discretion to allow unsupervised visitation and contact upon respondent-mother's compliance with the order.

¶ 11       On 22 October 2019, the trial court entered a custody review order finding that respondent-mother tested positive for oxycodone in January 2019, April 2019, and May 2019 and tested positive for amphetamines, heroin, and alcohol on 28 August 2019. Respondent-mother had failed to consistently engage in individual or group therapy, and her current engagement in treatment at A Fresh Start did not meet her

current level of need. The trial court found that respondent-father lost his housing in June 2019. He was diagnosed with cocaine, alcohol, cannabis, and opioid dependence and had not been compliant with requested drug screens. The trial court continued custody of the children with DSS, continued the children's placement with the maternal grandmother, authorized respondent-mother to live in the placement with the children, and continued respondent-father's supervised visitation with the children.

¶ 12 In January 2020, DSS learned that respondent-mother had taken the children, without the maternal grandmother, to Raleigh unsupervised. As a result, on 9 January 2020, Kate and Greg were moved to a foster home.

¶ 13 Following a permanency planning hearing on 16 January 2020, the trial court entered an order on 3 February 2020 finding that respondent-father was currently homeless and had not consistently engaged in treatment or services. Respondent-father had completed detox in May, June, and August of 2019. After his discharge from detox in June, "he went to an Oxford House but was asked to leave in the first week of July," and after his discharge from detox in August, he went to a halfway house but left after approximately two weeks. The trial court further found that respondent-mother had been unable to sustain consistent engagement in services to address her substance abuse and mental health issues until recently. She had tested positive for alcohol, heroin, and opiates in October, November, and December 2019,

and positive for alcohol in January 2020. Respondent-mother had not been in contact with DSS since 22 October 2019 and had failed to maintain stable housing and transportation. The primary permanent plan for Kate and Greg was changed to adoption with a secondary plan of reunification.

On 28 April 2020, DSS filed motions to terminate respondents' parental rights in Kate and Greg. DSS alleged that respondents had neglected the children, *see* N.C.G.S. § 7B-1111(a)(1) (2019), and willfully placed them in foster care or placement outside the home for more than twelve months without showing reasonable progress to correct the conditions which led to their removal, *see* N.C.G.S. § 7B-1111(a)(2) (2019).

Following hearings on 20 August 2020 and 8 September 2020, the trial court entered orders on 20 October 2020 concluding that grounds existed to terminate respondents' parental rights in the children pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). The trial court also concluded that it was in the children's best interests that respondents' parental rights be terminated and terminated respondents' parental rights. Respondents appeal.

## II. Analysis

### A. Respondent-mother's Appeal

Respondent-mother challenges some of the trial court's findings of fact as not being supported by the evidence and contends the trial court's findings of fact were

insufficient to support its conclusions that grounds existed to terminate her parental rights under N.C.G.S. § 7B-1111(a)(1)–(2). We first address termination under N.C.G.S. § 7B-1111(a)(1).

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

Under N.C.G.S. § 7B-1111(a)(1), a trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in

pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019). The conditions at issue must result in "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment . . . ." *In re Stumbo,* 357 N.C. 279, 283 (2003) (citation omitted).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.,* 375 N.C. 838, 841 (2020) (cleaned up). "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.,* 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.,* 257 N.C. App. 633, 637 (2018)).

¶ 19 Here, there were no allegations that respondent-mother was currently neglecting Kate and Greg at the time of the termination hearing. Moreover, it is undisputed that the children were out of respondent-mother's custody for an extended period of time and that they were previously adjudicated to be neglected juveniles on 13 August 2019. Accordingly, the issue before this Court is whether the trial court

properly determined that there was a likelihood of future neglect if the children were returned to respondent-mother's care.

¶ 20   In its termination orders, the trial court made numerous findings of fact to support its conclusion that grounds existed to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), as described in the background section of this opinion. The trial court found that respondent-mother failed to take the juvenile case, CPS involvement, and her substance use disorder seriously, and that respondent-mother's continued drug use, failure to maintain a safe and stable home, and failure to assure the children received necessary care and supervision subjected the children to the risks of physical and emotional harm and created an injurious environment. The trial court found that there was likelihood of a repetition of neglect if the children were returned to respondent-mother's care because she had not appropriately engaged in or completed recommended substance abuse or mental health treatment, and she had continued to deny that her substance use was an issue related to parenting, failed to understand concerns related to her unsupervised contact with and transporting of the children, failed to make any efforts to address her history of domestic violence and its impact on the children, and failed to maintain or establish a safe home for the children.

¶ 21   On appeal, respondent-mother first argues that "[o]ther than her drug screen test results showing substance use and the two incidents of a lack of supervision, and

her inconsistent engagement in therapy," there was no evidence presented of any actual impact or impairment suffered by the children. She asserts that the trial court's findings "shed little light" on how her substance use and inconsistent engagement in mental health treatment impacted the children. We disagree.

¶ 22       As noted above, to establish neglect, the conditions at issue must result in "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment . . . ." *In re Stumbo*, 357 N.C. at 283 (citation omitted). Here, the trial court made express findings that Kate and Greg were impaired or at a substantial risk of impairment as a result of respondent mother's neglect. Regarding both children, the trial court found:

> [81. and 82.] Respondent mother failed to take the juvenile case, CPS involvement, and her substance use disorder seriously. She incredulously fails to understand the noted safety concerns of the [children] unsupervised in her care while she continues to use unprescribed and illegal substances.[3]

¶ 23       Regarding Kate, the trial court found:

> 83. [Kate] was impaired and at a substantial risk of impairment as a result of Respondent mother's neglect. Specifically, this court finds [the] following facts:
>
> > a. This court references and fully incorporates Findings of Fact numbers 1 through 82 and subparts set forth above as if set forth fully below as findings

---

[3] This finding of fact is labeled as finding of fact number 82 in the order terminating respondent-mother's parental rights in Kate. It is labeled finding of fact 81 in the order terminating respondent-mother's parental rights in Greg.

of fact.

b. Respondent mother's continued drug abuse, her failure to maintain a safe and stable home, and her failure to assure that [Kate] receives necessary care and supervision subjects [Kate] to the risks of physical and emotional harm and creates an environment injurious to her welfare.

c. [Kate] exhibits parentified behaviors in relation to her younger sibling, [Greg], in that she has taken on the roles and responsibility of caretaker in the home due to improper supervision and care.

d. [Kate] is diagnosed with adjustment disorder and she is engaged in recommended weekly therapy.

e. Respondent mother has not had authorized unsupervised contact with [Kate] since custody was granted to Respondent father and then to [DSS] due to continued safety concerns related to her substance use.

f. While [Kate] was in the placement with [the maternal grandmother], there are noted concerns regarding Respondent mother having unsupervised contact and the extent to which [Kate] was providing care for [Greg] who exhibits significant disruptive behaviors.

¶ 24     Regarding Greg, the trial court found:

82. [Greg] was impaired and at a substantial risk of impairment as a result of Respondent mother's neglect. Specifically, this court finds [the] following facts:

a. This court references and fully incorporates Findings of Fact numbers 1 through 81 and subparts set forth above as if set forth fully below as findings of fact.

b. Respondent mother's continued drug abuse, her failure to maintain a safe and stable home, and her failure to assure that [Greg] receives necessary care and supervision subjects [Greg] to the risks of physical and emotional harm and creates an environment injurious to h[is] welfare.

c. [Greg] has exhibited difficulty in regulating his behaviors since [DSS] was awarded custody, including during placement with [the] maternal grandmother . . . , in his current foster home placement as well as daycare and school.

d. [Greg's] behaviors include not listening to directions, temper tantrums, problematic or lack of nighttime routine, sleep disturbance, and hitting.

e. [Greg] is diagnosed with adjustment disorder and he displays PTSD symptom[s]. He is engaged in recommended weekly individual therapy.

f. [Greg] had a recent psychiatric evaluation which recommended psychotropic medications to assist with his sleep. Lack of sleep has a corresponding negative impact on his behaviors.

g. On July 24, 2020, Respondent mother participated in a virtual meeting with UNC Psychiatry to discuss the recommendation of using psychotropic medication coupled with therapy to assist in managing [Greg's] behaviors and sleep disturbance. Respondent mother withheld consent for medication.

¶ 25      Respondent-mother contends that the foregoing findings of fact constitute "purported and speculated impairments or risks of impairment" to the children which were unsupported by the evidence and insufficient to support neglect. She also

challenges the portions of findings regarding the children's difficulty in regulating behavior, the children's diagnoses of adjustment disorder, and Kate's "parentified" behaviors, arguing that the evidence on these issues were presented at the disposition stage, not at the adjudication stage. A review of the record establishes that these arguments are without merit.

¶ 26 During the adjudicatory phase of the termination hearing, a DSS social worker testified that respondent-mother's multiple positive drug screens are what concerned DSS and caused the need for supervised contact with the children and that DSS was greatly concerned when respondent-mother transported the children unsupervised in January 2020. The DSS social worker also testified that during the time the children were placed in the home of their maternal grandmother and respondent-mother, they had "some behavioral needs." Kate exhibited "internalizing behaviors" such as "not wanting to show or to talk about her emotions, not feeling comfortable when she is feeling something, potentially withdrawing." She was diagnosed with adjustment disorder. The DSS social worker testified that Kate took on a parent role towards Greg and that it was concerning "because parentification of children is typically they're trying to fill a role for their parents [that] are not able or not willing to provide for their siblings."

¶ 27 The DSS social worker further testified that Greg had more "external behaviors" by engaging in outbursts, tantrums, failing to listen, and "choosing to do

his own task instead of what has been asked." After the children were placed in their foster home, "some of their behaviors became—like come to the forefront again, particularly for [Greg] in terms of the not listening." His behaviors "escalated" and included difficulty sleeping and hitting classmates or the foster mother. Greg underwent an assessment at UNC Psychiatry and was diagnosed with adjustment disorder and post-traumatic stress disorder. Medication to address Greg's difficulty sleeping was recommended, but respondent-mother did not consent to treatment. Thus, finding of fact 83c, d, and f of the order terminating respondent-mother's parental rights in Kate and finding of fact 82c, d, e, f, and g of the order terminating respondent-mother's parental rights in Greg are supported by clear, cogent, and convincing evidence.

¶ 28 Respondent-mother also argues that there was no evidence she failed to maintain a safe and stable home, and that from April 2019 until the termination hearings in August and September of 2020, there was no evidence she failed to provide necessary care or supervision subjecting either child to the risks of physical or emotional harm or created an environment injurious to their welfare. We disagree. Unchallenged findings of fact establish that while the children were placed in the maternal grandmother's home where respondent-mother also resided, respondent-mother was ordered to only have supervised contact with the children. DSS learned that on 11 July 2019, Greg stayed home with respondent-mother unsupervised, and

on 5 January 2020, respondent-mother drove the children unsupervised and without a valid driver's license. Thereafter, on 9 January 2020, the children were placed in a licensed foster home due to continued safety and supervision concerns in the maternal grandmother's home and lack of evidence of respondent-mother's sustained sobriety. Furthermore, respondent-mother moved out of the maternal grandmother's home after the children were placed in foster care and failed to be forthcoming about this residence. The trial court reasonably inferred from these unchallenged findings that the children were subjected to the risks of physical and emotional harm and that respondent-mother's drug use, failure to maintain a safe and stable home, and failure to assure the children received necessary care and supervision created an environment injurious to their welfare. *See In re D.L.W.*, 368 N.C. 385, 843 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom). Moreover, the trial court also made the reasonable inference that respondent-mother failed to understand or take seriously DSS's safety concerns of the children being unsupervised in her care while she continued to abuse illegal substances. *See id.* Accordingly, the trial court's findings of fact 82 and 83b in the order terminating respondent-mother's parental rights in Kate and findings of fact 81 and 82b in the order terminating respondent-mother's parental rights in Greg are supported by clear, cogent, and convincing evidence.

¶ 29     Next, respondent-mother challenges the trial court's determination that there existed a likelihood of a repetition of neglect if the children were returned to her care. She contends that the trial court failed to consider and address changed circumstances, pointing to the fact that she provided daily care for the children while they were placed in the maternal grandmother's home, there had been no domestic violence incidents involving respondent-mother since 2015, and she consistently visited the children and brought them toys after they were placed in foster care. We are not convinced.

¶ 30     As an initial matter, it is well established that the "trial court need not make a finding as to every fact which arises from the evidence; rather, the court need only find those facts which are material to the resolution of the dispute." *Witherow v. Witherow*, 99 N.C. App. 61, 63 (1990), *aff'd per curiam*, 328 N.C. 324 (1991). As previously stated, respondent-mother's failure to make progress in completing a case plan is indicative of a likelihood of future neglect. *In re M.A.*, 374 N.C. at 870. The trial court's unchallenged findings of fact reflect that respondent-mother had not adequately made progress in completing her case plan at the time of the termination hearing. After DSS obtained custody of the children in April 2019, she agreed to complete an updated mental health and substance abuse assessment and follow all recommendations, to comply with random drug screens including urine, hair and/or nail screens, and to be screened for potential participation in FDTC. However, by the

time of the termination hearing, she had not consistently engaged in mental health treatment, was not engaged in substance abuse treatment, continued to deny she had substance abuse issues, failed to follow substance abuse treatment and mental health recommendations, and tested positive or failed to comply with numerous random drug screens. Based on the foregoing, the trial court properly determined that respondent-mother neglected the children, and there was a likelihood of future neglect if Kate and Greg were returned to respondent-mother's care. Because the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, see *In re A.R.A.,* 373 N.C. 190, 194 (2019), we need not address whether the trial court erred in terminating respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2).

## B. Respondent-father's Appeal

Respondent-father's sole argument on appeal is that the trial court abused its discretion in determining that it was in Kate and Greg's best interests that his parental rights be terminated. Specifically, he contends that he had a strong bond with his children, and Greg's behaviors made adoption unlikely. Based on the reasons stated herein, we conclude the trial court did not abuse its discretion in determining that terminating respondent's parental rights was in the best interests of the children.

¶ 32        "If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. at 842 (citing *In re Young*, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110). Unchallenged dispositional findings are binding on appeal. *In re Z.L.W.*, 372 N.C. at 437. A trial court's best interests determination "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6 (citing *In re D.L.W.*, 368 N.C. at 842).

¶ 33        In determining whether termination of parental rights is in the best interests of a juvenile:

> The court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

¶ 34       In the instant case, the trial court made the following findings about Kate concerning the factors set forth in N.C.G.S. § 7B-1110(a):

> 105. [Kate's] age is seven (7). Her age is not a barrier to adoption.
>
> 106. Termination of Respondent father's parental rights is necessary to implement [Kate's] primary permanent plan of adoption. Adoption offers [Kate] the highest level of security and legal permanence.
>
> 107. Termination of parental rights [is] the only barrier to the adoption of [Kate] and this barrier be [sic] overcome in a reasonable period of time by entry of this order.
>
> 108. The likelihood of adoption is high. [Kate] is placed in a licensed foster home with [Greg]. The foster parents have expressed a willingness to adopt [Kate] while also recognizing the strong bond [Kate] has with [Greg].
>
> 109. While [Kate's] behaviors related to adjustment disorder and adjustment disorder can be managed by the foster parents through individual therapy and parenting strategies, [Greg] exhibits behaviors for which medication has been recommended, but not yet started due to lack of consent.
>
> 110. The foster parents are interested in adopting [Kate and Greg] as a sibling group; however, they want to ensure that they can manage [Greg's] needs. They are optimistic in following treatment recommendations, including psychotropic medication, for [Greg] to allow for both [children] to be adopted.

111. In the event the current foster parents do not adopt [Kate], her likelihood of adoption is still high due to her age, resilience, engagement in services, and overall positive disposition. Locating another adoptive family is not a barrier to her adoption.

112. [Kate] and Respondent father exhibit a strong parent-child bond at visits. They greet each other with big smiles and hugs. She engages well with him at visits, although at times, Respondent father has struggled to interact during visits. [Kate] is able to end visits without issue.

113. [Kate] has a positive, caring relationship with her foster parents who are a proposed adoptive placement. The foster parents have a six-year old son with whom she has a sibling relationship. The foster home is child-friendly and centered, and [Kate] is encouraged to take advantage of being a child by playing outside or in her room instead of feeling responsibility for supervision of the juvenile. She feels safe and secure in this placement.

¶ 35    In a separate order, the trial court made the following findings about Greg concerning the factors set forth in N.C.G.S. § 7B-1110(a):

105. [Greg] is age five (5). His age is not a barrier to adoption.

106. Termination of Respondent father's parental rights is necessary to implement [Greg's] primary permanent plan of adoption. Adoption offers [Greg] the highest level of security and legal permanence.

107. Termination of parental rights [is] the only barrier to the adoption of [Greg] and this barrier be [sic] overcome in a reasonable period of time by entry of this order.

108. The likelihood of adoption is significant. [Greg] is placed in a licensed foster home with [Kate]. The foster parents recognize the strong bond [Greg] has with [Kate],

and they would like to adopt them as a sibling group.

109. [Greg] has displayed concerning behaviors in the foster placement related to his diagnosis of adjustment disorder and corresponding display of PTSD symptoms. The foster parents and current proposed adoptive placement have been working with [Greg's] therapist to learn strategies to modify [Greg's] behaviors, including positive reinforcement and a behavior chart.

110. While these strategies have been helpful, UNC Psychiatry has recommended [Greg] take medications to help with his sleep disturbance which correlates to his negative behaviors. While Respondent father eventually consented to the recommended regime on August 10, 2020, Respondent mother did not consent to the medication.

111. The foster parents are interested in adopting [Greg and Kate] as a sibling group; however, they want to ensure that they can manage [Greg's] needs. They are optimistic in following treatment recommendations, including the use [of] psychotropic medication in addition to therapy to address [Greg's] behaviors to be stabilized.

112. [Greg] is in need of permanency and this uncertainty has a negative impact on his therapeutic needs. Termination of parental rights would allow for adoption to be pursued to allow for a secure, stable placement.

113. In the event the current foster parents do not adopt [Greg], his likelihood of adoption is still high due to his age, engagement in therapeutic services, and positive improvement based on routine and proper supervision. Locating another adoptive family is not a barrier to his adoption due to his age and positive demeanor of [Kate] with whom he shares a special bond.

114. [Greg] and Respondent father exhibit a strong parent-child bond at visits. They greet each other with big smiles and hugs. [Greg] engages well with him at visits, although

at times, Respondent father has struggled to interact during visits. [Greg] had difficulty separating at some of the initial visits, but he is currently able to end visits without issue and he does not ask about him between the visits.

115. [Greg] has a positive, caring relationship with his foster parents who are a proposed adoptive placement. The foster parents have a six-year old son with whom he has a sibling relationship. This relationship has been strained due to [Greg's] behaviors; however, there is encouragement from his providers that medication will assist in addressing these negative behaviors and improve the relationship with all family members. The foster home is child-friendly and centered, and [Greg] is encouraged to take advantage of being a child by playing outside or in [h]is room. The foster parents provide [Greg] a safe and secure placement to allow him the time to adjust to the many transitions in his young life.

¶ 36    First, respondent-father argues the trial court erred in finding that termination of his parental rights was the only barrier to adoption. Yet, the record evidence clearly supports this finding. A DSS social worker testified that adoption had been identified as the children's primary permanent plan, and the "only" barriers to achieving that permanent plan were respondents' parental rights. Thus, finding of fact 107 in both orders terminating respondent-father's parental rights in the children is supported by the evidence.

¶ 37    Second, respondent-father contends that Greg's behaviors made the likelihood of adoption unlikely and that the trial court's finding that the likelihood of Greg's adoption is "significant" contradicts its later finding that in the event his current

foster parents do not adopt him, his likelihood of adoption "is still high[.]" We do not find the trial court's use of the term "significant" and "high" in reference to the likelihood of Greg's adoption to be contradictory or inconsistent. A DSS social worker testified that Greg's current foster placement was open to adoption, and although Greg's behavioral issues and need for continued treatment constituted barriers, the foster parents were "willing to keep trying to address the behaviors to make sure they can meet [Greg's] needs." The DSS social worker further testified that the foster parents wanted to follow "the recommendations of [Greg's] treating physicians at UNC Psychiatry and the need for medication[.]" A guardian ad litem court report also indicates that "[w]ith the implementation of the therapeutic plan[,] the likelihood of finding an adoptive home [for Greg] is good." Thus, we do not find respondent-father's arguments compelling.

¶ 38      Third, respondent-father asserts that the trial court failed to acknowledge that the likelihood of implementing Kate's permanent plan of adoption was connected to the marked improvement of Greg's mental health and behavioral status. We disagree with this assessment. In finding of fact 110 of the order terminating respondent-father's parental rights in Kate and 111 of the order terminating respondent-father's parental rights in Greg, the trial court found that while the foster parents were interested in adopting the children "as a sibling group," they wanted to "ensure that they can manage [Greg's] needs." The trial court also found that the foster parents

were optimistic in following treatment recommendations to stabilize Greg's behaviors. These findings reflect the trial court's recognition that Kate's adoptability was related to the treatment of Greg's behaviors and the foster parents' ability to manage his needs. Respondent-father further asserts that the trial court erred in finding that it was highly likely that Kate would be adopted, but this finding is supported by the guardian ad litem's court report, which states that "[t]here are no known barriers which would make it difficult [for Kate] to find an adoptive home."

¶ 39        Fourth, respondent-father argues that the children's bond with the foster parents "paled in comparison" to the bond they shared with respondent-father. He directs the Court's attention to the fact that he regularly talked on the phone and saw his children during visitation, the children were excited to see him and show him affection, the children were sad to see him leave, and he brought them food and toys at visits. He asserts that the trial court paid "little attention" to the lack of bond the children had with the foster parents to justify terminating his parental rights. We do not agree with respondent-father's contentions. The trial court's findings of fact 112 and 113 in the order terminating respondent-father's parental rights in Kate and findings of fact 114 and 115 in its order terminating respondent-father's parental rights in Greg reflect the trial court's consideration of the children's "strong parent-child bond" with respondent-father, as well as the children's "positive, caring relationship with their foster parents[.]" The bond between respondent-father and his

children is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and "the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. 432, 437 (2019).

The trial court's findings demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. at 101. "Because the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors," *id.*, we conclude that the trial court did not abuse its discretion in concluding that termination of respondent-father's parental rights was in Kate and Greg's best interests. Accordingly, we affirm the trial court's order terminating respondent-father's parental rights in Kate and Greg.

## III.    Conclusion

The trial court did not err in concluding that grounds existed to terminate respondent-mother's parental rights in Kate and Greg pursuant to N.C.G.S. § 7B-1111(a)(1). The trial court did not abuse its discretion in concluding that it was in Kate and Greg's best interests that respondent-father's parental rights be terminated.  Accordingly, we affirm the trial court's orders terminating respondents' parental rights in Kate and Greg.

AFFIRMED.